United States District Court
Southern District of Texas
**ENTERED**
November 25, 2020
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHARP IRON GROUP, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-19-5022 |
| | § | |
| TOTAL E&S, INC., et al., | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the bankruptcy court's order issued on remand from this court. The facts are set out fully in the court's 2018 Memorandum Opinion and Order in Civil Action No. 4:18-01974. In brief, Sharp Iron is a manufacturer of metal parts, and Total is a manufacturer of proprietary equipment in the oil and gas industry. In 2013, the parties entered into two purchase orders drafted by Total to manufacture power frames used in fracking pumps for a price of $26,000 per frame. In late 2014, Total began to ask for a slowdown in the scheduled delivery of the pumps. Sharp Iron finished twenty frames that it already had in production. After about a year of communications back and forth about the slowdown, Sharp Iron sued Total in state court on December 29, 2015. On January 18, 2016, Total sent a letter that provided the written notice of termination required by the purchase orders. Sharp Iron mitigated by selling six frames at below the contract price. Total filed for bankruptcy. Sharp Iron filed a proof of claim.

In April 2018, the bankruptcy court sustained the debtors' objection to Sharp Iron's proof of claim. *In re CJ Holding Co*, et al., Case No. 16-bk-33590, (Docket Entry No. 2306). Sharp Iron asked the court to alter or amend its order, and the bankruptcy court denied the motion. *Id.* at (Docket Entry Nos. 2321, 2341). Sharp Iron appealed.

1

Sharp Iron's first appeal centered on two issues: (1) whether Total breached by refusing to take possession of, or pay for, the twenty frames that Sharp Iron manufactured and tendered for delivery before Total's written termination notice and, (2) if Total did breach, whether it nevertheless owed no damages because the purchase orders gave Total the unilateral right to terminate at any time. This court remanded the case for findings on the following issues:

> [W]hether Total attempted in good faith to agree on adjustments to the delivery schedule or price; whether Total violated its obligation to use reasonable effort to take physical possession of goods tendered for delivery before effectively changing Sharp's performance; and whether and when Total terminated the purchase orders, with what consequence.

2018 Memorandum and Order at 10. On remand, the bankruptcy court held a full-day evidentiary hearing and considered another round of briefs. (Docket Entry No. 10 at 8). It entered an order finding that Sharp Iron had tendered twenty frames before Total terminated the purchase orders. (Docket Entry No. 11-4 at 44). The bankruptcy court also found that "Total did not act in bad faith or breach the purchase orders prior to the termination date" and awarded Sharp Iron damages of contract price less mitigation for the twenty tendered frames. *Id*.

In this appeal, Sharp Iron argues that the bankruptcy court erred in several ways: (1) by finding that Total was not liable for breach of contract; (2) by awarding Sharp Iron damages for twenty tendered frames instead of the thirty-seven that Sharp Iron argues it tendered; (3) by failing to assess damages for unfinished frames and frames deemed not tendered; (4) by subtracting the full contract price of the six frames Sharp Iron was able to sell as mitigation when Sharp Iron sold the frames for less than the contract price; and (5) by declining to award attorney's fees and prejudgment interest. (Docket Entry No. 9 at 2–3).

Total argues that the questions addressed by the bankruptcy court on remand were factual and that the bankruptcy court made the required findings, supported by record evidence, on each issue. Each question is analyzed below.

## I. Legal Standard

"[T]raditional appellate standards" apply to a district court's review on an appeal from a bankruptcy court's judgment or order under 28 U.S.C. § 158(a). *Stern v. Marshall*, 564 U.S. 462, 475 (2011). This court reviews the bankruptcy court's conclusions of law de novo and findings of fact for clear error. *See, e.g.*, *In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007); *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003). The bankruptcy judge's opportunity to make first-hand credibility determinations entitles its assessment of the evidence to deference by the district court, and the district court may not weigh the evidence anew. *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). Rather, the district court must determine whether the evidence supports the bankruptcy court's findings and set them aside only if left with "the definite and firm conviction that a mistake has been committed." *In re Dennis*, 330 F.3d 696, 701 (5th Cir.2003); *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003).

## II. Analysis

### A. Breach of Contract

The first issue is how the bankruptcy court addressed Sharp Iron's breach of contract allegation. Sharp Iron argues that the bankruptcy court did not make the requisite finding that Total is liable for breach of the purchase order obligation to take delivery of the frames. Sharp Iron also argues that the bankruptcy court did not make an express finding that Total's failure to take delivery was "improper," a finding necessary to support breach of contract. (Docket Entry No. 9 at 36-37).

A breach of contract is the "[n]on-performance of a duty when performance is due." Restatement (Second) of Contracts § 235 (1981). In its 2018 Memorandum and Order, this court concluded that Total's failure to fulfill its contractual duty to take delivery of the tendered goods would result in liability. *See* 2018 Memorandum and Order at 10 (citing *Anadarko Petrol. Corp. v. Williams Ala. Petrol., Inc.*, 737 F.3d 966, 971 (5th Cir. 2013) (when the supplier has already discharged its full performance under the contract by tendering the goods, the purchaser's "obligation to pay the correct contract price . . . is no longer executory and thus survives the contract's termination")). Applying this court's opinion on remand, the bankruptcy court found that "Sharp [was] entitled to a general unsecured claim based on the number of frames that were manufactured and tendered for delivery prior to the termination date less mitigation." (Docket Entry No. 11-4 at 44). The bankruptcy court found that Total breached the contract when it concluded that Total was liable for the frames Sharp Iron tendered before Total terminated the contract. There is nothing left for this court to resolve.

### i. Pretermination Breach

Sharp Iron next argues that the bankruptcy court's finding that "Total did not act in bad faith or breach the purchase orders prior to the termination date" conflicts with an award of damages for breach of contract. The record does not support this argument.

Breach occurs when performance is due and not performed. *See* Restatement (Second) of Contracts § 235 (1981). In this case, the timing of the breach depends on the meaning of "delivery" in the purchase orders. As this court noted in its 2018 Memorandum and Order, the parties disputed the meaning of "delivery" under the agreement. Sharp Iron argued that it meant tender within the meaning of § 2.503(a) of the Texas Business and Commerce Code; Total argued that it meant actual delivery to Total's possession. 2018 Memorandum and Order. at 10-11. On remand,

and the bankruptcy court resolved the issue by finding that Total was liable for 20 frames that Sharp Iron tendered in its August 2015 email, implicitly adopting Sharp Iron's definition of "delivery" in the purchase orders.

Under the purchase orders, payment was due within 45 days of "delivery," which the bankruptcy court found was August 12, 2015. (*See* Docket Entry No. 10 at 8). But the purchase orders also provided Total with the unilateral right to alter the purchase orders, and a procedure for Sharp Iron to seek equitable adjustments for those changes. The purchase orders do not set out a deadline for Total to respond to Sharp Iron's requests for equitable adjustments:

> Total reserves the right to make changes in (1) the specification, drawings, and sample, if any; (2) the method of shipment or packaging; (3) the place and time of performance; and (4) the articles and materials, including the quantity thereof, to be furnished by the Seller (each a "Change") . If any such Change cause an increase or decrease in the cost of, or the time required for performance of a Purchase Order, an equitable adjustment shall be made in the contract price or performance schedule, or both, by mutual agreement. Any request by Seller to adjust the terms of any applicable Purchase Order as a result of a Change must be submitted to Total in writing within thirty (30) days from the date Seller receives notice of the Change.

(Docket Entry No. 9 at 419).

The bankruptcy court found that Sharp Iron sought an equitable adjustment from Total in its August 2015 email, when it "imposed a $25 storage fee for the frames held on its production premises." (Docket Entry No. 11-4 at 44). The bankruptcy court also found that the record did not show that Total responded to that request. (*Id.*). The finding that the request for equitable adjustment was still pending when Total terminated the contract is consistent with the determination that Total was not in breach until it terminated without paying for the tendered frames.

        ii.    **The Presence of Good Faith or the Absence of Bad Faith?**

Sharp Iron also asserts the following errors:

5

>   (a) the finding that Total exercised it[s] right to modify the delivery schedule in good faith is irrelevant, (b) Total could not "modify" the delivery schedule into perpetuity and never take delivery of frames before termination, (c) Total improperly—not in good faith—failed to agree to a new delivery schedule or take delivery of tendered conforming frames, and (d) the finding of no "bad faith" can be disregarded since it is the wrong legal standard.

Sharp Iron's arguments on these points fail because the bankruptcy court's findings are well-supported by an extensive factual record. This court found in its 2018 Memorandum and Order that "[n]othing in the purchase orders limited Total's right to reduce the number of frames it would accept or to defer shipments." 2018 Memorandum and Order at 11. Total highlights ample evidence in the record supporting the conclusion that Total did not intend to modify the purchase agreements "into perpetuity" or as an end-run around termination. (Docket Entry No. 10 at 22-27). Instead, there is support in the record for Total's contention that it intended to resume taking frames when it was economically feasible. The bankruptcy court's finding that Total did not act in "bad faith" was not clearly erroneous.

Sharp Iron also argues that the bankruptcy court's finding that Total did not act in "bad faith" was erroneous because the bankruptcy court failed to apply a "good faith" standard. Parties have "a statutory obligation to act in good faith in the performance, enforcement[,] and modification of [their] agreements." 2018 Memorandum and Order at 12 (alteration in original) (citing *Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 363–64 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)); *see also Bray Int'l, Inc. v. Computer Assocs. Int'l, Inc.*, No. CIV H-02-0098, 2005 WL 3371875, at *3 (S.D. Tex. Dec. 12, 2005) (applying Texas law and stating that "the absence of good faith in the performance of contractual duties constitutes a breach of contract"). The Texas Business and Commerce Code defines good faith as "honesty in fact [and] observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM. CODE ANN. § 3.103 (quotations omitted). Sharp Iron cites to some opinions drawing a

6

distinction between bad and good faith. The Supreme Court of Texas has explained that the terms "good faith" and "bad faith" are close, but they carry different burdens of proof. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). As applied here, Total had the burden to prove that it affirmatively acted in good faith; Sharp Iron had the burden to show that Total acted in bad faith. *See id*. But, in one of the other cases Sharp Iron cites, the court uses good and bad faith interchangeably, finding that the absence of good faith, or bad faith is just an ordinary breach of contract. *Bray Int'l,* 2005 WL 3371875, at *3.

The bankruptcy court's finding that Total did not act in bad faith is supported by the record. Whether it is Sharp Iron's failure to prove Total's bad faith by a preponderance of the evidence, or Total's success in meeting its burden to prove its good faith, the record supports the bankruptcy court's finding. Total struggled with business difficulties that made its compliance with the purchase order schedule and obligations difficult. It communicated its efforts to seek different solutions before resorting to termination. The bankruptcy court's finding of no bad faith was not clearly erroneous.

### B. Twenty or Thirty-Seven Frames?

The bankruptcy court made a factual finding that 20, not 37, frames were tendered, based on evidence in the record. That finding was not clearly erroneous.

This issue turns on which frames were actually "tendered" versus merely completed. Under the Texas Business and Commerce Code, "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." TEX. BUS. & COM. CODE § 2.503(a); 2018 Memorandum and Order at 10–11. "The manner, time and place for tender are determined by the agreement and [Chapter 2 of the Texas Business and Commerce Code]." *Id.*

7

Evidence in the record reflects that, in August 2015, Sharp Iron sent an email stating that twenty frames were complete and asking Total to take delivery. (*See* Docket Entry No. 10 at 28). Sharp Iron argues that record evidence also shows that it repeatedly asked Total to take delivery of "at least 37 frames" during meetings and in proposed delivery schedule that it sent to Total by email. (Docket Entry No. 9 at 35–36).

The findings that Sharp Iron tendered 20 frames because it specifically asked Total to take delivery in its August 2015 email, and that Sharp Iron did not tender the remaining frames are amply supported in the record. The bankruptcy court found that, in its August 2015 email, unlike in subsequent communications, Sharp Iron imposed a monthly storage fee that triggered tender and represented "a nonconforming request for equitable adjustment." (Docket Entry No. 11-4 at 44). There is no basis to find reversible error.

### III.  Damages

This court reviews the bankruptcy court's damage award under the clear error standard. *See Lebron v. United States*, 279 F.3d 321, 325 (5th Cir. 2002) (on appeal, a "damages award is a finding of fact, which [the appellate] court reviews for excessiveness using the clear error standard."); *see also Stern v. Marshall*, 564 U.S. at 475.

#### A. Reliance and Lost Profits

Sharp Iron argues that, under Texas Business and Commerce Code § 2.708(b), it is entitled to reliance and lost profits damages for any finished frames not deemed tendered and for unfinished because the frames are "specialized piece[s] of equipment that ha[ve] no market value." (Docket Entry No. 9 at 37 (quoting *Lakewood Pipe of Tex., Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 555-56 (Tex. App.—Houston [1st Dist.] 1991, no writ)). Total argues that Sharp Iron "ignores this Court's prior ruling and the impact of a successful termination under § 2 [of the

8

purchase agreements]," and asserts that Sharp Iron's position should be disregarded. (Docket Entry No. 10 at 31). But, as Sharp Iron notes, this court did not rule on damages in either its 2018 Memorandum Opinion and Order or in its 2019 clarification of that order, because this court remanded the issue of whether there was a breach at all. (Docket Entry No. 9 at 36-37).

There is some case law support for the proposition that § 2.708(b)—including lost profits and reliance damages—should apply when a seller is unable to mitigate or manufactures a specialized piece of equipment that it is unable to resell. *See, e.g. Fiberlok, Inc. v. LMS Enters., Inc.*, 976 F.2d 958, 965 (5th Cir. 1992) (the district court properly assessed damages under § 2.708(b) when the buyer's breach caused the seller's factory to close, excusing its duty to mitigate); *Lakewood Pipe*, 814 S.W.2d at 555-56 (finding that § 2.708 applies when the seller manufactured a specialized piece of equipment with no market value).

But whether this proposition applies is a fact-intensive inquiry. Sharp Iron was able to sell six of its frames. The bankruptcy court found that the record it considered "fail[ed] to establish that Sharp acted in a commercially reasonable manner to mitigate its damages upon being continually advised of and agreeing to the ongoing requests for delays in delivery dates under the purchase orders." (Docket Entry No. 11-4 at 44). The bankruptcy court did not clearly err in finding that Sharp Iron was entitled to damages for only the 20 tendered frames.

## IV.     Mitigation Damages

The bankruptcy court found that "[s]ix of the 20 tendered frames were subsequently sold by Sharp" and that "[t]he record does not reflect the specific amounts received by Sharp Iron for these 6 frames." The bankruptcy court therefore subtracted the full purchase order price for six frames from Sharp Iron's damage award. Because the record unequivocally shows that the

9

mitigation price was less than the contract price, the bankruptcy court clearly erred by subtracting the full contract price of the six frames from Sharp Iron's recovery.

In its 2018 Memorandum and Order, this court noted that Sharp Iron was only able to sell six frames by April 2018, "at a lower price than the purchase order price Total had agreed to pay," citing the record. 2018 Memorandum and Order at 5. Sharp Iron also provided several citations in the record showing that it sold the frames at $19,000 a piece, less a 4% sales commission. (Docket Entry No. 9 at 41-42). Total did not dispute this calculation at oral argument.

Because the record leaves this court with "the definite and firm conviction that a mistake has been committed," *In re Dennis*, 330 F.3d at 701, the damages award is reversed on this narrow point. The correct amount of mitigation damages to be subtracted from Sharp Iron's damage award is $19,000 less a 4% sales commission per frame. The correct total is calculated as follows: [20 (tendered frames) X $26,000] – [6 (mitigated frames) X ($19,000 (.96))] = $410, 560.00.

## V. Attorney's Fees and Interest

Sharp Iron argues that it is entitled to an award of attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code because it prevailed at least in part in its breach of contract claim. (Docket Entry No. 9 at 44). Sharp Iron also asserts that the bankruptcy court erred by failing to provide any rationale for declining to award prejudgment interest. (*Id.* at 45). Total first disputes whether Sharp Iron properly preserved these issues. (Docket Entry No. 10 at 31). The record shows that Sharp Iron was not crystal clear in preserving the issue, but it did raise the issues on remand and detailed the fees in its proof of claim. (Docket Entry No. 12 at 21). This is enough to preserve the issue for review on appeal.

The Texas Civil Practice and Remedies Code provides that a person may recover reasonable attorney's fees as well as the amount of the claim and costs, where the claim is for "an

oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001; *see also Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002) (stating "[t]he award of reasonable attorneys' fees is mandatory under § 38.001 if the plaintiff prevails in his or her breach of contract claim and recovers damages"). At oral argument, Total, for the first time, raised the issue of whether Sharp Iron could recover post-petition attorney's fees as an unsecured creditor. An argument raised for the first time during oral argument is waived. *Employer Sols. Staffing Grp. II, L.L.C. v. Office of Chief Admin. Hearing Officer*, 833 F.3d 480, 489 n.6 (5th Cir. 2016). Total has waived its argument that the court may not award postpetition fees.

Even if Total had not waived the argument, the balance of authority tips in favor of awarding Sharp Iron postpetition attorney's fees based on the valid prepetition contract, even given the unsecured nature of the claim. This issue hinges on two provisions of the Bankruptcy Code: Section 502 and Section 506. *See* 11 U.S.C. §§ 502, 506. In *Travelers Casualty & Surety Company of America v. Pacific Gas & Electric Company*, 549 U.S. 443 (2007), the Supreme Court affirmed that, under Section 502 "claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed," but declined to address whether Section 506(b) bars claims by unsecured creditors for postpetition attorney's fees. *Id.* at 452, 455; *see also In re 804 Cong., L.L.C.*, 756 F.3d 368, 380 (5th Cir. 2014) ("the Supreme Court [in *Traveler's*] expressly declined to consider whether § 506(b) categorically disallows *unsecured* claims for contractual attorney's fees.") (citation and quotation marks omitted). After the Supreme Court's decision in *Travelers*, the Second, Fourth, Seventh, and Ninth Circuits concluded that unsecured creditors may recover postpetition fees based on a prepetition contract. *Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143, 145 (2d Cir. 2009) ("the Code does not prohibit an unsecured creditor from collecting post-petition attorneys' fees pursuant to an otherwise enforceable pre-

11

petition contract of indemnity."); *SummitBridge Nat'l Investments III, LLC v. Faison*, 915 F.3d 288, 291 (4th Cir. 2019) (concluding "like our sister circuits" that § 502(b) and § 506(b) of the Bankruptcy Code do not "expressly disallow[] a creditor . . . from asserting an unsecured claim for post-petition attorneys' fees based on a valid pre-petition contract."); *In re Sokolik*, 635 F.3d 261, 267 (7th Cir. 2011) ("Finding no applicable exception in the Bankruptcy Code" and affirming an award of postpetition attorney's fees based on a valid contract); *In re SNTL Corp.*, 571 F.3d 826, 844 (9th Cir. 2009) ("we hold that attorneys' fees arising out of a prepetition contract but incurred postpetition fall within the Bankruptcy Code's broad definition of claim"). The First and Eleventh Circuits have also found that such attorney fee awards are permissible. *Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1, 6 (1st Cir. 2007) ("disallowing claims in their entirety based on section 506(b) defies common sense"); *In re Welzel*, 275 F.3d 1308, 1317 (11th Cir. 2001).

Like other district courts that have considered this question, which has not been decided by the Supreme Court or the Fifth Circuit, this court does "not have anything new to add to this debate" except to "agree[] with the position adopted by every court of appeals faced with this question." *In re Tribune Media Co.*, No. 1:15-CV-01116-RGA, 2018 WL 6167504, at *2 (D. Del. Nov. 26, 2018). Because Sharp Iron prevailed, at least in part, on its breach of contract claim as discussed above, Sharp Iron is entitled to pre- and postpetition fees. (*See* Docket Entry No. 9 at 44–45).

## VI. Prejudgment Interest

Sharp Iron argues that the bankruptcy court improperly denied prejudgment interest without any rationale. (Docket Entry No. 9 at 45 (citing *Am. Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 537 (5th Cir. 1987)). Total argues that Sharp Iron has waived this issue as well, (Docket Entry No. 10 at 31), but the record does not support finding waiver. As it did

with fees, Sharp Iron pleaded for prejudgment interest and submitted its proof of claim including prejudgment interest to the bankruptcy court. (*See* Docket Entry No. 9 at 45).

Section 502 of the Bankruptcy Code disallows claims for "unmatured interest." 11 U.S.C. § 502(b)(2). Under Section 502, "[g]enerally, where a debtor is insolvent, the Bankruptcy Code does not allow payment of post-petition interest on unsecured claims in a chapter 11 case." *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 644 (Bankr. S.D. Miss. 2010) (collecting cases). But "[b]ankruptcy courts award pre-judgment interest for a claim adjudicated by the bankruptcy court, and have determined that Section 502(b)(2) does not exclude pre-petition, prejudgment interest for a claim that is later liquidated or determined post-petition." *In re Trendsetter HR, LLC*, No. 16-34457-SGJ11, 2017 WL 4457435, at *9 (Bankr. N.D. Tex. Aug. 15, 2017), *aff'd*, 596 B.R. 509 (N.D. Tex. 2019), *aff'd sub nom. Matter of Trendsetter HR L.L.C.*, 949 F.3d 905 (5th Cir. 2020) (citing *In re Lamarre*, 269 B.R. 266, 269 (Bankr. D. Mass. 2001)).

As discussed above, the bankruptcy court found that Total breached the purchase orders and awarded damages. Sharp Iron's breach of contract claim is governed by Texas law. *See Matter of* Trendsetter, 949 F.3d at 910 (explaining that state law governs contract disputes that are the basis of bankruptcy claims); (Docket Entry No. 9 at 416 (the purchase orders, containing a Texas choice-of-law provision)).[1] "Texas law plainly requires an equitable award of prejudgment interest to a prevailing plaintiff as a matter of course." *Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F.

---

[1] The Fifth Circuit has explained that there are two bases for awarding prejudgment interest under Texas law are an enabling statute and general principles of equity:

> Statutory prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases. On the other hand, equitable prejudgment interest, which focuses on the need to compensate a plaintiff for the defendant's beneficial use of the damage funds between the time the injury occurred and the time the judgment was rendered, is available as a matter of course, absent exceptional circumstances.

*Matter of Okedokun*, 968 F.3d 378, 392 (5th Cir. 2020). This case involves an equitable award of prejudgment interest.

13

App'x 253, 258 (5th Cir. 2017) (citing *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329 (5th Cir. 1994)). The trial court may exercise discretion to deny the award in "exceptional circumstances." *Id.*

Remand to determine if exceptional circumstances are present to justify the denial of prejudgment interest is one clearly permissible course. *Executone*, 26 F.3d at 1330. But this case has already been up and down like an appellate yo-yo. It would be good to avoid yet another round trip. Fortunately, the record is sufficient for this court to determine, based on the extensive record the parties put before the bankruptcy court and that court's findings, that this case does not present exceptional circumstances requiring the denial of prejudgment interest. Total has not raised or identified any exceptional circumstances. The fact that Sharp Iron did not prevail completely on its claims does not justify denial of prejudgment interest in this context. *Id.* (the policy underlying equitable awards of prejudgment interest is "advanced by awarding prejudgment interest to a party who has received part of the relief he has sought no less than by making the award in cases in which the party prevails completely.").

The clear absence of exceptional circumstances that could result in a denial of prejudgment interest means that this court can, and does, find that prejudgment interest should be awarded. *See Precision Homes, Inc. v. Cooper,* 671 S.W.2d 924, 931 (Tex. App. 1984), *writ refused* (Nov. 7, 1984) (reversing a denial of equitable prejudgment interest and rendering judgment awarding prejudgment interest).

The record and law make it clear that prepetition prejudgment interest should be calculated from the date that Sharp Iron filed suit, on December 29, 2015. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998) ("prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim

or (2) the date suit is filed."); 2018 Memorandum and Order at 2–4 (setting out the facts of the dispute based on the bankruptcy court record).

Under Texas law, prejudgment interest accrues at the statutory rate of postjudgment interest, which is currently 5%. *See Paisano Capital SA de CV v. Velazquez*, No. 7:19-CV-078, 2019 WL 6649294, at *14 n.146 (S.D. Tex. Dec. 6, 2019) (collecting cases); TEX. FIN. CODE § 304.003. The arithmetical calculations to award prejudgment interest for the relevant period and at the rate of 5% do not require remand.

### VII. Conclusion

The bankruptcy court's findings are affirmed in most part and reversed in one part, as set forth above. This court awards Sharp Iron $410,560.00 for the tendered frames and attorney's fees. The court vacates the bankruptcy court's denial of prejudgment interest and awards prepetition, prejudgment interest from the date the underlying contract suit was filed, at the rate of 5%.

Counsel stipulated to $90,432 in attorney's fees before this court remanded the case to the bankruptcy court. Counsel for Sharp Iron must submit a post-judgment bill of fees and costs including the reasonable attorney's fees incurred after remand. Counsel for Sharp Iron is to prepare a proposed final judgment and circulate it to Total. The parties must submit a proposed final judgment no later than December 11, 2020, indicating any areas of dispute.

SIGNED on November 24, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge